## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) LAURA NEAL, as Special Administratrix of )
    the Estate of PARKER STEPHENS, Deceased, )  Attorney Lien Claimed
                               )  Jury Trial Demanded
     Plaintiff, )
                                 )
vs.                           )  CASE NO.:  CIV-23-114-PRW
                                 )
(1) OKLAHOMA COUNTY CRIMINAL )
   JUSTICE AUTHORITY, )
(2) BOARD OF COUNTY COMMISSIONERS )
   FOR OKLAHOMA COUNTY, )
(3) JACOB HAMILTON, )
(4) MATTHEW FRANCIS, )
(5) WILLIAM CUNNINGHAM, )
                                 )
     Defendants. )

## COMPLAINT

**COMES NOW**, the Plaintiff Laura Neal, as Special Administratrix of the Estate of Parker Stephens, deceased, and for her Complaint against the above-named Defendants, states and alleges as follows:

## PARTIES

1.    Plaintiff Laura Neal, as Special Administratrix of the Estate of Parker Stephens ("Mr. Stephens"), deceased, is a citizen of the State of Oklahoma and Special Administratrix of Mr. Stephens' Estate.

2.    Defendant Oklahoma County Criminal Justice Authority ("OCCJA" or "Jail Trust") is a public trust created for the furtherance of purported public functions pursuant to 60 Okla. Stat. § 176, *et seq.* OCCJA was created by a certain "Trust Indenture." Under the Trust Indenture, OCCJA is to "assist" Oklahoma County in its stated objective of

operating the Oklahoma County "Jail Facilities", which includes the Oklahoma County Detention Center ("Oklahoma County Jail" or "Jail"). Under the Trust Indenture, OCCJA was delegated the responsibility of developing policies and procedures to address the administration of the Jail. However, the Trust Indenture specifically provides that the Oklahoma County Sheriff was to continue operating the Jail until such time as the OCCJA and Oklahoma County had entered into a lease agreement and/or funding agreement(s) that specifically provided for the OCCJA to commence responsibility for management and operation of the Jail. OCCJA did not take over responsibility for management and operation of the Jail until June 1, 2020. However, since June 1, 2020, OCCJA has remained the County entity with primary responsibility for the management and operation of the Jail. The Oklahoma County Sheriff and a member of the Oklahoma County Board of County Commissioners are permanent members / trustees of the OCCJA. OCCJA is sued under Plaintiff's municipal liability theory.

3.     Defendant Board of County Commissioners for Oklahoma County ("Board", "BOCC" or "Oklahoma County") is the legislative entity with non-delegable statutory responsibility for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe-keeping of inmates and detainees. *See* 57 O.S. § 41. As a matter of Oklahoma law, BOCC exercises the powers of the county. *See* 19 Okla. Stat. § 3. A suit brought against BOCC is the way Oklahoma law contemplates suing the county. *See* 19 Okla. Stat. § 4. BOCC is charged with ensuring that the Jail has adequate funding and resources to provide constitutionally sufficient conditions of confinement.

4.     Defendant Jacob Hamilton ("Hamilton" or "Officer Hamilton") is a citizen of Oklahoma. Hamilton was, at all times relevant hereto, acting under color of state law as employee and/or agent of Oklahoma County/OCCJA.

5.     Defendant Matthew Francis ("Francis" or "Cpl. Francis") is a citizen of Oklahoma. Francis was, at all times relevant hereto, acting under color of state law as employee and/or agent of Oklahoma County/OCCJA.

6.     Defendant William Cunningham ("Cunningham" or "Officer Cunningham") is a citizen of Oklahoma. Cunningham was, at all times relevant hereto, acting under color of state law as employee and/or agent of Oklahoma County/OCCJA.

## JURISDICTION AND VENUE

7.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendment(s) to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

8.     This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendment(s) to the United States Constitution and 42 U.S.C. § 1983.

9.     The acts complained of herein occurred in Oklahoma County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## FACTUAL BACKGROUND

**Facts Specific to Mr. Stephens**

10.     Paragraphs 1-9 are incorporated herein.

11.     Mr. Stephens was booked into the Oklahoma County Jail in early 2020.

12.     It was documented in Mr. Stephens' Jail file and medical chart that he suffered from serious mental health conditions, including anxiety disorder, psychosis, affective disorder and alcohol and drug dependency. He was also prescribed anti-depressant anti-psychotic medication.

13.     At various times during Mr. Stephens' stay at the Jail, he was placed on suicide watch and/or housed in the Jail's mental health unit.

14.     When housed in general population, Mr. Stephens was frequently seen, by Jail staff, talking to himself in his cell.

15.     On January 11, 2021, Mr. Stephens was interviewed, via "Zoom", by a State-appointed psychologist. The psychologist warned that Mr. Stephens must be "monitored closely by detention center personnel" because of his history of suicidal thoughts. During the interview, Mr. Stephens reported to the psychologist that he had previously attempted suicide four times and had been hospitalized in 2019 after one attempt. Mr. Stephens also told the psychologist that the Jail had placed him on suicide watch once in July 2020.

16.     However, despite this clear warning and directive, Mr. Stephens was not monitored closely at the Jail. Rather, consistent with the longstanding policy, practice and custom of understaffing the Jail and failing to provide a Constitutionally adequate level of supervision to ensure inmate safety, Mr. Stephens was mostly ignored by facility staff.

17.     As of February 2, 2021, Mr. Stephens was housed on the second floor of the Jail, in general population, in cell C26. Mr. Stephens' cell mate was an inmate named Ismael Ruiz.

18.     At approximately 8:07 p.m. on the evening of February 2, Inmate Ruiz observed Mr. Stephens in his bunk having what he believed to be a seizure. More specifically, Inmate Ruiz saw and heard Mr. Stephens shaking uncontrollably with a white substance around or coming out of his mouth.

19.     Concerned that Mr. Stephens' life was in danger, Ruiz used the emergency phone in the cell to call the Jail's dispatcher in "Camera Ops"/master control. At around 8:08 p.m., the "Camera Ops", Officer Cunningham, picked up the phone, "What's your medical emergency?" Ruiz replied, ***"I think my cellie's been through a seizure right now."*** Officer Cunningham then asked what cell, and Ruiz advised the cell was 2 C36.

20.     After receiving the call from Inmate Ruiz, Officer Cunningham radioed the detention officer assigned to the second floor that evening, Officer Hamilton, and notified him of the medical emergency in cell C36. However, with deliberate indifference, Officer Hamilton did not go to C-pod and check on Mr. Stephens.

21.     After three (3) minutes passed without anyone coming to check on Mr. Stephens, Inmate Ruiz called Camera Ops"/master control a second time. Once again, Officer Cunningham pick up the phone, "What's your medical emergency?" Inmate Ruiz responded: ***"My cellie man, he's not okay."*** Officer Cunningham advised, ***"I've called, they know."*** Inmate Ruiz replied: ***"What the hell man, this shit is not okay."***

22.     Officer Cunningham took no further action to ensure that Mr. Stephens was checked on or otherwise received any medical attention. And, despite having a report that an inmate in Cell C36 was likely having a seizure, ***Officer Hamilton never went to check on Mr. Stephens the night of February 2.*** He never called for a physician or nurse. He did not dial "911". With deliberate indifference to Mr. Stephens' health and safety, Officer Hamilton did absolutely nothing.

23.     The following morning, February 3, 2021, Inmate Ruiz left cell C36 to go to court.

24.     In the early morning of February 3, around 5:00 a.m., an inmate trustee, "Ponce", went to cell C36 to provide breakfast trays. Inmate Ponce entered the cell and put a tray on the desk. Inmate Ponce yelled "Trays out!" It was at this time that Inmate Ponce noticed that Mr. Stephens' leg was hanging off the bunk in an odd position. Mr. Stephens was not moving or responding. Normally, Mr. Stephens was eager to get his tray in the morning. Inmate Ponce found it concerning that Stephens was not getting up or responding.

25.     Inmate Ponce immediately told Officer Hamilton, who was still on shift from the night before, that he should check on Mr. Stephens as something was not right. Even at this point, Officer Hamilton did not check on Mr. Stephens. Rather, Hamilton blithely stated "Oh, he's alright", and went on about his other duties on the Second Floor.

26.     At around 8:40 a.m. on February 3, Cpl. Francis entered C-pod (also known as "2 Charlie") on the Second Floor to begin "med pass". He started med pass from cell 24 to cell 1 in the bottom tier. He then went to the top tier of the pod and started med pass

and recreation from cell 26-50. When he opened cell C36, Cpl. Francis called a couple of times for Mr. Stephens to come out for recreation. Cpl. Francis noted that Mr. Stephens was not breathing or moving. Cpl. Francis then called for a nurse and a gurney.

27.   LPN "Kali" entered the cell and felt for a pulse on Mr. Stephens' leg. There was no pulse. LPN Kali then attempted to get detect a pulse from his neck and wrist. There was no pulse. LPN Kali next told officers in the cell to secure the area as a crime scene.

28.   It was far too late to save Mr. Stephens. Shortly after cell C36 had been declared a crime scene, the Medical Examiner arrived and advised that Mr. Stephens was in "rigor" and had been dead "for hours".

29.   Based upon a "limited" autopsy, the Medical Examiner ruled Mr. Stephens' death a suicide with the probable cause of death being "ligature asphyxiation." Mr. Stephens was just 21-years-old.

30.   Subsequent investigation revealed multiple disturbing failures to supervise, monitor, assess and assist Mr. Stephens that are consistent with the long-standing failure to adequately staff and supervise the Jail.

31.   To begin with, Officer Hamilton was the only officer working the entire Second Floor of the Jail on the evening of February 2. This was wholly inadequate staffing to reasonably ensure inmate safety.

32.   While Officer Hamilton documented hourly sight checks in the logbook, review of the surveillance video shows that nearly all of these sight checks did not happen. Indeed, Hamilton failed to check on Mr. Stephens even after the call went out that an inmate was having a seizure in cell C36.

33.     Surveillance video of C-Pod shows the following: (1) Hamilton was present in C-Pod for feeding and med pass from 6:28 p.m. to 7:24 p.m. on February 2; (2) Hamilton did not return to C-Pod until ***almost 10:00 p.m.***, around an hour and ½ after Officer Cunningham radioed concerning a medical emergency in C36; (3) Hamilton was in C-Pod from 10:00 p.m. to 10:20 p.m. but did not check on Mr. Stephens. Further, even if Hamilton had looked into Cell C36 that night, because the light in the cell was inoperative, a simple visual check of the cell would have been insufficient to constitute a "welfare check".

34.     Video surveillance shows that Officer Hamilton did not open the door of cell C36 until 4:00 a.m. on February 3, and even then, he did not check on Mr. Stephens. Instead, he merely pulled Inmate Ruiz out of the cell for court.

35.     While the Oklahoma Jail Standards and Jail policy require officers to visually check on detainees/inmates in their cells at least once an hour, Officer Hamilton, who was assigned to the 2nd floor the night of February 2, failed to perform  any visual checks of C-Pod approximately from 7:00 p.m. to 10:00 p.m., and even failed to check on Mr. Stephens after being notified of a medical emergency in cell C26.

36.     C-Pod was left without any supervising officer on the evening of February 2 due to the long-standing custom and practice of understaffing and overcrowding at the Jail.

37.     The Eighth Amendment and Fourteenth Amendment alike require that inmates and detainees be provided reasonably adequate conditions of confinement.

38.     Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

39.     The failure of Officer Hamilton to check on Mr. Stephens' welfare, even with knowledge that he was in the midst of a life-threatening medical emergency, constitutes a failure to protect Stephens with deliberate indifference to a serious medical need and to Stephens' health and safety.

40.     Officer Hamilton also failed in his gatekeeper role by failing to contact any medical provider or professional to assist Mr. Stephens.

41.     In addition, Cpl. Francis, who was the supervisor assigned to the Second Floor on the evening of February 2 and morning of February 3, failed to check on Mr. Stephens' welfare and failed to assure that Hamilton was adequately monitoring the inmates, including Stephens.

42.     On information and belief, Cpl. Francis knew, or should have known, about the medical emergency alerted by Inmate Ruiz on the night of February 2, but, with deliberate indifference, disregarded the substantial risks to Mr. Stephens by failing to check on his welfare, failing to assure thar Hamilton checked on Stephens and failing to notify any medical personnel.

43.     In addition, at least after the second call from Ruiz, Officer Cunningham, having notice that Mr. Stephens' dire condition was not being addressed should have immediately contacted medical staff and/or called 911. His failure to do so constitutes deliberate indifference.

44.     As a direct proximate result of Hamilton, Francis and Cunningham's unlawful conduct, Mr. Stephens suffered actual and severe physical injuries, physical pain and suffering and emotional and mental distress and death.

45.     With timely and appropriately emergency response, it is more likely than not that Mr. Stephens would have been saved.

■ **County Policies and Customs**

46.     Paragraphs 1-45 are incorporated herein.

47.     There is an affirmative link between the aforementioned unconstitutional acts and/or omissions of Officer Hamilton, Cpl. Francis and Officer Cunningham and policies, practices and/or customs which Oklahoma County/OCCJA promulgated, created, implemented and/or possessed responsibility for.

48.     To the extent that no single officer violated Mr. Stephens' constitutional rights, Oklahoma County/OCCJA are still liable under a theory of a systemic failure of Oklahoma County/OCCJA policies and procedures as described below. There were such gross deficiencies in staffing, facilities and procedures that Mr. Stephens was effectively denied constitutional conditions of confinement.

49.     From its inception in 1991, the Jail has been systemically deficient. Overcrowding, under staffing, inadequate security and supervision have been constant.

50.     Following a lengthy investigation, in 2008, the U.S. Department of Justice issued a report on conditions of confinement at the Jail. The DOJ found woefully inadequate supervision and staffing at the Jail, a lack of basic medical and mental health care, overcrowding and a high rate of inmate assaults and deaths.

51.     A copy of this DOJ Report was sent to Defendant BOCC or Jail Trust, in their official capacity by sending it to John Whetsel, Oklahoma County Sheriff in 2008, as well as the Oklahoma County District Attorney and the United States Attorney for the

Western District. As such, Defendants BOCC and Jail Trust were on notice and aware of the constitutional deficiencies addressed by the DOJ Report.

52.     In 2013, the Tenth Circuit Court of Appeals held that the County was not entitled to summary judgment in a Jail suicide case involving an inmate named "Holdstock". *See Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 872 (10th Cir. 2013). In so holding, the *Layton* Court relied on the DOJ Report and reports from Oklahoma State Department of Health ("OSDH"), as follows:

> The DOJ Report—the product of four separate inspections of the jail—concluded that "certain conditions at the Jail violate the constitutional rights of detainees confined there." Aplt. App., Vol. I, at 155 (DOJ Investigation of the Okla. Cnty. Jail, dated July 31, 2008). The report stated that four years had passed between the DOJ's first three tours of the jail and its most recent one, but "[d]espite this opportunity to improve conditions at the Jail, ... [the DOJ] did not observe improved conditions." Id. at 154.
>
> More specifically, the DOJ report stated that ***"actual direct supervision of detainees at the Jail is virtually non-existent [and the] facility is not adequately staffed to maintain necessary supervision of detainees to secure their safety."*** Id. at 157. It further found that: (1) ***conditions at the jail make it "difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of the detainees,"*** id. at 158; (2) the crowded conditions "tax numerous areas of Jail operations and create circumstances that contribute to unconstitutional conditions," id. at 157 n. 4; (3) ***"detention officers have little time to actually monitor detainees [and] detainees are often left unsupervised for extended periods of time,"*** id. at 158; (4) while surveillance cameras have been installed in many areas of the jail, "***blind spots exist*** within the housing units, ***such as in ... the inside of the cells, which cannot be monitored with cameras,"*** id.; and (5) "[c]ompounding the lack of adequate detainee supervision within the housing units is limited visibility into the individual cells," id.
>
> During the DOJ's tours of the jail, they "uncovered instances where detainees were not provided access to medical care, specifically acute services—with dire results." Id. at 166. While the jail has a "sick call system for detainees to access routine medical care services, detainees' serious medical needs are not

adequately met." Id. (emphasis added). Again noting problems with non-routine care, the report included the finding that the jail **"*has had some problems providing appropriate access to medical care during emergencies.*"** Id. at 167. The report described an incident where the medical care that the jail furnished to a detainee was, in the DOJ's opinion, "'unconscionable' during the hours she was in critical need of access to medical care." Id.

The report outlined several recommended remedial measures, which, in the DOJ's view, should "at a minimum" be implemented "to address the constitutional deficiencies identified ... and protect the constitutional rights of detainees." Id. at 173. Among these, the ***DOJ recommended that the jail "implement policies and procedures to allow adequate supervision of detainees. This should include[ ] conducting adequate staff rounds ... and promptly responding to medical or other emergencies.*"** Id. Within a general admonishment to "ensure the timely assessment, identification and treatment of detainees' medical ... needs," the report outlined a need to "[p]rovide timely and appropriate treatment for detainees with serious medical ... conditions," and provided that "detainees with chronic diseases [should] receive screening, testing, treatment, and continuity of care," and that the jail should "[p]rovide medications ... in a timely manner." Id. at 174. Further, according to the DOJ, the jail should "[p]rovide medical and mental health staffing sufficient to meet detainees' serious medical and mental health needs ... includ[ing] staffing to provide timely ... medical care." Id. at 175.

*Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 864–65 (10th Cir. 2013)

(emphasis added).

53.     Ultimately, the *Layton* Court held and found that "a reasonable jury could find that the County and [the Oklahoma County Sheriff] were on notice as to the problems with the jail's medical-care system, and that had they taken any number of possible remedial actions—many of which were explicitly identified by the DOJ and OSDH—Mr. Holdstock's condition would not have deteriorated and his death could have been avoided by timely medical intervention." *Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 872 (10th Cir. 2013).

54.     It is clear that systemic deficiencies identified by DOJ and the *Layton* Court -- including understaffing and other conditions at the Jail that make it "difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of the detainees" – were never reasonably addressed by the County or the Jail Trust and persisted and continued through February of 2021.

55.     Since 2008, the Department of Justice has been identifying deficiencies at the OCDC including: a. overcrowding; b. physical layout of the facility prohibiting adequate sight and sound supervision; c. an inordinately high risk of violence due to inability to properly supervise; and d. inadequate staffing numbers.

56.     In 2012, the DOJ cited that the OCDC was still short-staffed and compromising inmate health and safety.

57.     From at least 2008 to present, BOCC has failed to provide sufficient oversight and funding of the Jail. Due to the documented dangers at the Jail, including DOJ's finding of inadequate supervision and staffing and a high rate of inmate deaths, in 2009, BOCC entered into a Memorandum of Understanding with the federal government. Under this Memorandum of Understanding, Oklahoma County was to adequately fund and staff the jail by 2014, or face court action from the federal government to force compliance.

58.      As of February 2021, Oklahoma County had plainly not complied with the requirements of Memorandum of Understanding with the Department of Justice.

59.     From at least 2008 to present, chronic shortage of detention officers and the facility's flawed design have made it impossible to adequately supervise the Jail.

60.     Documented insufficient staffing levels and the poor condition of the 30+-year-old jail building have contributed to high death rates, numerous assaults and a lack of basic rights for inmates at the Jail over the past decade.

61.     At the time of the incident involving Mr. Stephens, the Jail employed fewer detention officers to supervise inmates, and other officers, than it did in 2008.

62.     Due to the lack of adequate staffing, overcrowding and an attitude of indifference toward inmate safety, preventable acts of violence and inmate deaths became commonplace at the Jail.

63.     In December of 2020, two inmates, Roy Lee Parkerson and Aaron Cooper, were violently assaulted by other inmates, in two separate incidents, while no detention officer provided any supervision or protection.

64.     Four (4) other detention officers have been charged criminally for uses of excessive force on inmates who left their cells to shower or use the toilet without permission.

65.     Three former detention officers face misdemeanor charges of cruelty for placing detainees in a "standing stress position," a well-known "enhanced interrogation" or torture tactic, and forcing them to listen to the children's song "Baby Shark".[1] The detention officers sometimes used the song as a form of discipline for inmates who left their cells.

---

[1]     Though these incidents occurred in 2019, when the Sheriff's Office operated the Jail, the Jail Trust is the successor entity for the purposes of municipal liability and BOCC has remained responsible for the Jail during all pertinent time periods.

66.     Due to inadequate staffing, the "Baby Shark" victims were mostly left alone in their pods. One victim was singled out for punishment after he rigged the old, faulty lock in his cell so he could walk freely around the jail pod, shower and use a toilet with more privacy than the one in his shared living area.

67.     As summarized in the Probable Cause Affidavits, the blatantly unconstitutional conduct of the "Baby Shark" officers, "Miles, Butler and Hendershott", was open, obvious and repeated. Yet, no one from Oklahoma County stepped in to take remedial action.  This exemplifies a systemic and deep-seated failure to train and supervise, with respect to the most basic aspects of correctional operations and constitutional conditions of confinement. As stated in the Probable Cause Affidavits:

> Upon interviewing DO Miles, he confirmed that he and Butler systematically worked together and used the benches, bars and attorney booth as a means to discipline inmates and teach them a lesson because they felt that disciplinary action within the Detention Center was not working in correcting the behavior of the inmates. Butler also confirmed that he used the booth as a means of punishment. Miles further stated that the inmates often "pissed off" Butler which evidence suggests led to those inmates being taken out of their cells/pods and mistreated. The secure point on the wall was measured as being 3ft from the floor up the wall. At this height and with no chair to sit on, it would have been nearly impossible for most inmates to sit or kneel thus forcing them to stand.

> Statements made by inmates and staff also indicated that in addition to the corporal punishment given by Miles and Butler, they additionally worked together and played children's music on a loop to play repetitively aloud while the inmates were housed in the attorney visitation booth thus putting undue emotional stress on the inmates who were most likely already suffering from physical stressors. The playing of the music was said to be a joke between Miles and Butler as confirmed by Miles.

> Additional evidence showed that Detention Officers Miles and Butler worked under their direct supervisor, Lt. Hendershott, who **failed to properly supervise and discipline** them. Miles and Butler were the

subject of numerous inmate complaints that detailed their ***history of mistreatment of inmates*** ranging from retaliation to mishandling of inmate mail. In addition, nearly ***20 hand written inmate complaints*** were received at one time regarding one or both Officers and directly forwarded to their supervisor, Lt. Hendershott. Evidence suggests that no investigation was conducted and subsequently no corrective action was taken by their direct supervisor, Lt. Hendershott. Evidence also showed that when Hendershott first learned of inmate mistreatment by Miles and Butler on 11-23-19, he took no immediate action to either aid the inmate victim or discipline the Officers. ***This appeared to have led to the Officers continuing to mistreat inmates where at least an additional six (6) inmates were physically victimized.***

68.     Another inmate, Charlton Chrisman, died in 2017 after he was shot at close range more than a dozen times with pepper balls by detention officers at the Jail. His family filed a federal civil rights lawsuit. BOCC recently approved a $1.1 million settlement of that lawsuit.

69.     Just one month before Mr. Stephens died at the Jail, another inmate, Brad Lane, was violently and loudly assaulted and bludgeoned by his cell mate for 40 minutes before any officer showed up. There was no officer monitoring the because of the short staffing. By the time detention staff arrived on the floor, Lane was already dead. Mr. Lane's death, like Mr. Stephens' death, resulted from grossly deficient staffing, supervision and security.

70.     The Jail Trust retained consultant David Parker to provide recommendations to remedy the continuing deficiencies at the Jail. Parker issued a report finding outdated training and policies and procedures, a staff consensus is that "every issue that transpires in the jail can be traced to staff shortages", and staff being trained to detect and/or intervene in inmate incidents appropriately.

71.     In May 2021, the National Institute of Corrections provided a report to the BOCC and Jail Trust finding: a. an incomplete staffing plan; b. that new hires receive limited training; c. "[c]lear and convincing present level of staffing was insufficient for a safe and secure jail"; d. it was "[i]mpossible to effectively manage inmate population when they are so short-staffed;" e. that officers were coming to work without proper training; and f. a lack of policies and procedures posted.

72.     In October of 2021, an inmate named Ta'Vion Murphy was subjected to an inmate-on-inmate assault when another detention officer, Dominique Thomas, allowed access an inmate access to Murphy for the purposes of permitting an assault of Murphy. Murphy was subsequently stabbed nearly 30 times.

73.     Defendants BOCC and Jail Trust have been deliberately indifferent to the DOJ's reports, the *Layton* decision, and other clear evidence, warning that short staffing and overcrowding would continue to lead to violence and deaths, in violation all detainees' constitutional rights.

74.     Numerous news and internet articles also made Defendants BOCC and Jail Trust aware well prior to February 2021 of the unreasonable conditions at the Jail, for example, Business Insider reported that "Over the past 15 years, the 13-story jail, in Oklahoma City has had many alleged problems, from unsanitary conditions to negligent car of inmates, poor medical care, and outright abuse of inmates. A clerical worker at the Jail posted a YouTube video claiming inmates had been beaten right in front of her." (BUSINESS INSIDER, The stories coming out of this Oklahoma jail are horrifying, February 25, 2015).

75.     Oklahoma County/OCCJA plainly failed to adequately train and supervise its officers, in violation of County policies and the Oklahoma Jail Standards, including Officer Hamilton and Cpl. Francis, with respect to, *inter alia*: supervision of inmates, protection of inmates, emergency medical care, adequate medical care for injured inmates, cruel or inhumane corrections practices and constitutional requirements for the conditions of confinement.

76.     In finding constitutional liability at the county level, the Tenth Circuit, in *Tafoya v. Salazar*, 516 F.3d 912, 919 (10th Cir. 2008), pointed to evidence of an "undisciplined culture of 'anything-goes' among the detention officers [that] remained unaddressed and unmitigated by Sheriff Salazar, who continued to employ a hands-off approach to jail management." Here, as discussed throughout, the County's/Jail Trust's "management style" has been "hands-off" at best and describing the culture at the Jail as "undisciplined" and "anything goes" would be charitable.

77.     Lastly, the County/BOCC/Jail Trust's "medical emergency" policy, practice and custom is facially unconstitutional. That is, as designed, it is the policy at the Jail that when an inmate calls in a medical emergency to "Camera Ops", the officer contacts the detention staff on the floor, but does not contact medical staff.  The dangers with such a policy, practice and custom are obvious, particularly in a facility with chronic understaffing and inadequate supervision. It is axiomatic that medical staff should be alerted when a medical emergency is alerted by an inmate or detainee. Any contrary policy is inherently dangerous as it all but guarantees that inmates in need of emergent medical attention will not receive it.

78.     The County/BOCC/Jail Trust have had abundant opportunity to increase funding, supervision and training which would allow it to properly staff and address the systemic deficiencies that have plagued the Jail for well over 10 years. Its failure to do so has resulted in injury to multiple detainees, including Mr. Stephens. Its failure to take reasonable measures to alleviate known and substantial risks to inmates like Mr. Stephens constitutes deliberate indifference at the municipal level.

## CAUSES OF ACTION

### VIOLATION OF THE EIGHTH AND/OR FOURTEETH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)

79.     Paragraphs 1-78 are incorporated herein by reference.

### A.     Individual Liability and Underlying Violation of Constitutional Rights

- **Conditions of Confinement/Failure to Protect/Deliberate Indifference**

80.     At the time of the complained events, Mr. Stephens had a clearly established constitutional right to humane conditions of confinement, including reasonable safety from serious bodily harm and adequate medical care.

81.     Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

82.     Officer Hamilton, Cpl. Francis, and Officer Cunningham failed to protect Mr. Stephens from serious bodily harm and failed to ensure that he received timely medical attention despite notice that he was at excessive risk of harm. This is deliberate indifference.

83.     As a direct proximate result of  Officer Hamilton, Cpl. Francis and Officer Cunningham's unlawful conduct, Mr. Stephens suffered actual and severe physical injuries, physical pain and suffering and emotional and mental distress and death.

### B. Municipal Liability

84.     Paragraphs 1-83 are incorporated herein by reference.

85.     The unconstitutional aforementioned acts or omissions of Officer Hamilton, Cpl. Francis, and Officer Cunningham are causally connected with customs, practices, and/or policies which Oklahoma County/OCCJA/BOCC promulgated, created, implemented and/or possessed responsibility for.

86.     To the extent that no single officer violated Mr. Stephens' constitutional rights, Oklahoma County/OCCJA are still liable under a theory of a systemic failure of Oklahoma County/OCCJA policies and procedures as described herein. There were such gross deficiencies in staffing, facilities and procedures that Mr. Stephens was effectively denied constitutional conditions of confinement.

87.     Those customs, practices, and/or policies are outlined in Paragraphs 46-78, *supra.*

88.     Oklahoma County/OCCJA/BOCC knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Mr. Stephens were at substantial risk of harm.   Nevertheless, Oklahoma County/OCCJA/BOCC failed to take reasonable measure to alleviate the risk of harm.

89.     Oklahoma County/OCCJA/BOCC, through its failure to take reasonable remediable measures has been deliberately indifferent to citizens', including Mr. Stephens', health and safety.

90.     As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Stephens suffered injuries and damages as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant her the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages for Officer Hamilton, Cpl. Francis, and Officer Cunningham's reckless disregard of Mr. Stephens' federally protected rights, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

***Attorneys for Plaintiff***